Jeffrey BOEHNER, Tom Fok,
and Springland Trading,
Inc., Plaintiffs,

v.

Lyn HEISE, Joan Eckes, and Ginseng
Board of Wisconsin, Defendants.

No. 03 Civ. 5453(THK).

United States District Court,
S.D. New York.

Aug. 12, 2010.

David John Hoffman, Law office David J. Hoffman, Joseph Thomas Roccanova, Yuen Roccanova Seltzer & Suerd LLP, New York, NY, for Plaintiff.

Steven Andrew Morgenlender, Patrick Michael Murphy, Steven Andrew Morgenlender, McCabe, Collins, McGeough & Fowler, LLP, McCabe, Collins, McGeough & Fowler, LLP, Carle Place, NY, for Defendant.

## MEMORANDUM OPINION AND ORDER

THEODORE H. KATZ, United States Magistrate Judge.

Plaintiffs Jeffrey Boehner, Tom Fok, and Springland Trading, Inc. (collectively, "Plaintiffs") bring this diversity action against Defendants Lyn Heise, Joan Eckes, and the Ginseng Board of Wisconsin (collectively, "Defendants"), asserting claims for libel, tortious interference with economic relations, tortious interference with prospective business relations, and breach of contract. Plaintiffs allege that Defendants leveled defamatory accusations against them in a letter to Senator Russell Feingold of Wisconsin, in an effort to convince the United States Customs Service ("Customs") to detain shipments of Plaintiffs' ginseng product. Plaintiffs further contend that Defendants did so to wrongly interfere with, and gain a competitive advantage over, Plaintiffs' wholesale and retail ginseng trade business. As a result, Plaintiffs contend that they suffered severe economic harm. (*See* Complaint ("Compl.").)

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. They contend that the statements contained in their January 2, 2003 letter to Senator Feingold (the "letter") are not actionable because they were truthful. Moreover, Defendants argue, even if the statements were inaccurate, they are subject to a qualified privilege and are not actionable, as Plaintiffs fail to demonstrate that Defendants acted with malice. Defendants also contend that Plaintiffs' tortious interference claims are without merit because Plaintiffs fail to sub-

mit proof of any interference with an existing contract or prospective business relationship. Defendants further argue that Plaintiffs' tortious interference claims are barred by the Noerr–Pennington doctrine. Finally, Defendants argue that they did not breach their contract with Plaintiffs to provide Wisconsin Ginseng Program Seals ("seals"), because they provided Plaintiffs with the requested seals within a reasonable period of time after being provided requested documentation and payment. (*See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment, dated Mar. 29, 2010 ("Defs.' Mem.").)

Plaintiffs oppose the motion, arguing that there are material issues of fact in dispute on each of their claims. (*See* Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment, dated May 19, 2010 ("Pls.' Mem.").)

The parties have consented to trial before this Court, pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Defendants' motion is granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts, except as otherwise noted, are undisputed and drawn primarily from the parties' affidavits and statements pursuant to Local Civil Rule 56.1 of the Southern District of New York.

### I. The Parties

Plaintiffs, Jeffrey Boehner ("Boehner"), Tom Fok ("Fok"), and Springland Trading, Inc. ("Springland"), are New York wholesalers and retailers of ginseng and other medicinal herbs and roots. Among Springland's products are two types of ginseng—the Asian root, which is grown primarily in East Asia, and the Wisconsin root, which is overwhelmingly cultivated in one county in Wisconsin.

Defendant, the Ginseng Board of Wisconsin, Inc. ("GBW"), is a non-profit corporation created by statute and regulated by the Wisconsin Department of Agriculture, Trade and Consumer Protection (the "DATCP"). GBW is an independent trade organization, which is elected, operated, and funded wholly by producers and handlers of Wisconsin ginseng, to administer the ginseng marketing order promulgated by the DATCP. GBW's primary functions are to promote the welfare of the Wisconsin ginseng industry and to protect its product from unfair competition. As part of its responsibilities. GBW operates the Wisconsin Seal Program to assure the authenticity and protect the integrity of Wisconsin ginseng products, by guaranteeing consumers that the products they buy contain 100% pure Wisconsin ginseng. (*See* Deposition Transcript of Joan Eckes, dated Apr. 22, 2008 ("Eckes Dep."), at 19–20:18–4.) A seal is attached to barrels of Wisconsin ginseng and delivered to wholesalers, who are then permitted to affix the seal to the ginseng that they sell either to retailers or the general public. (*See* Deposition Transcript of Lyn Heise, dated Apr. 23, 2008 ("Heise Dep."), at 15–16:19–3.)

As of January 2, 2003, Defendant Joan Eckes was the manager of GBW. Up until 1998, Eckes had grown and cultivated ginseng in the state of Wisconsin. As of January 2, 2003, Defendant Lyn Heise was a member of GBW. At all times relevant to this action, Heise was a grower of Wisconsin ginseng.

### II. The Letter

Shortly before January 2, 2003, GBW began to develop concerns regarding the importation of Asian ginseng, based on conversations Eckes had with Customs employee Cornelia Miller and other government officials. (*See* Defs.' 56.1 St. ¶ 5.)

Specifically, GBW became concerned about imported ginseng that was clearing Customs in New York, even though it contained impermissibly high levels of pesticides, among other things. Some of GBW's concerns related directly to Springland. (*See id.* ¶ 6.) According to Eckes, Jeffrey Boehner's name "kept cropping up as far as, you know, getting shipments out of customs, and his name is very similar to the head of customs."[1] (*See* Eckes Dep. at 86.) In addition, Eckes received the so-called "hot list" on a monthly basis, which listed companies scheduled to receive imported ginseng that was flagged for inspection. (*See id.* at 45–46.) Although Springland was on the "hot list," Eckes believed, based on her conversations with Customs employees and other government officials, that certain shipments to Springland were not being tested.[2] (*See id.* at 89–90.)

In light of these concerns, on January 2, 2003, Eckes and Heise sent a letter to United States Senator Russell Feingold of Wisconsin, on behalf of GBW. The letter requested assistance from Senator Feingold, noting that large quantities of foreign ginseng imports that were either fraudulent, or contaminated with pesticides, were being shipped to the United States each year. It claimed that California Customs and the FDA were effectively preventing such shipments from entering the market. However, the letter then went on to say that in New York, shipments that previously were denied entry in California and scheduled for testing for pesticides, were released from the port without undergoing the required tests.

Following the description of the New York problem, Defendants stated that:

Specifically, Jeffrey Bonner [sic], has been very successful in getting shipments released for his boss, Tom Fok. Tom Fok and his companies were "hot listed"—yet, nothing happened. Every month his shipments *are not being tested, yet some others are.* Supposedly Jeffrey Bonner [sic] worked for Customs before working for Tom Fok and Ming Fok. The fact that New York Customs will not hold his shipments to test them in port, while testing others, shows an extreme problem. On a rare occasion [that] customs actually came to Tom Fok's warehouse, tests are done on "switched" samples in the Springland Warehouse. Barrels released to the warehouse by Customs aren't sealed so that only Customs can open the barrel—a small yellow tag can easily be transferred.

We are asking for your assistance since apparently Springland warehouse now contains thousands of pounds of untested imported root. He imports 1 million pounds of root each year, shipments every week of approximately 25,000 pounds. What is needed is an official inquiry from a U.S. Senator specifically asking that the testing be done in port, with no release to his warehouse. Many surprises will be forthcoming.

(*See* Defs.' Mem. Ex. C.)

Defendants concluded the letter saying "The Wisconsin Ginseng Industry is very

---

**1.** At the time, GBW was apparently under the (mistaken) impression that Jeffrey Boehner was related to former Customs Commissioner Robert C. Bonner. GBW believed that their last names were both spelled "Bonner," but pronounced differently. (*See* Eckes Dep. at 86.)

**2.** Plaintiffs do not dispute that Defendants received information from Customs employees and other government officials that caused these concerns, but contend that the information received was "not well-grounded." (*See* Pls.' 56.1 St. ¶ 6.) Plaintiffs offer no further elaboration.

appreciative of your efforts to aid our industry and to insure the safety of Americans." (*Id.*)

## III. Searching of Plaintiffs' Imports

Plaintiffs believe that the letter "caused, and continues to cause, U.S. Customs Agents in New York to repeatedly hold and strip-test Springland's entire ginseng shipment inventory at the port of arrival." (*See* Pls.' Mem. at 6.) They base their contention on the patterns and practices of Customs in inspecting their imported ginseng, both before and after the letter was written.

Before the letter was written, in November 2002, the United States Food and Drug Administration ("FDA") issued a "hold design" for one of Plaintiffs' imported shipments. A "hold design" is a notice requiring a sampling and examination of the marked product. Upon inspection, pesticides were discovered within the shipment, leading to the package's rejection and shipment back to its sender. (*See* Deposition Transcript of Jeffrey Boehner, dated Nov. 23, 2009 ("Boehner Dep."), at 106–08:7.) The FDA also held, tested, and denied entry to another of Plaintiffs' imported shipments, that was sent by air, because of pesticides found in a sample. (*See* Deposition Transcript of Tom Fok, dated Nov. 24, 2009 ("Fok Dep."), at 47–55:14; Boehner Dep. at 136–138:1.)

During the time in which the imports were being held and sampled, they were allowed entry and were kept in a segregated space adjacent to Plaintiffs' warehouse facility, on West 29th Street in New York City, until the completion of the tests. The only people who had access to the locked storage facility were Boehner and Fok. (*See* Boehner Dep. at 112–113:1.) It appears that Defendants' statements in the letter regarding the "switching" of samples were inferring that Boehner and Fok

would mislabel Asian ginseng in their storage facility, that had been flagged for inspection, as Wisconsin ginseng, thus evading inspection altogether. (*See id.* at 56–58.)

Following GBW's letter to Senator Feingold, in the winter and spring of 2003, Customs in New York stripped and held approximately twelve containers containing ginseng that were imported by Plaintiffs. (*See* Boehner Dep. at 56–57:20.) Boehner believed that, during this time, Springland's imports were being stripped and held with a greater than normal frequency. Customs continued to perform these searches even though they did not find any problems with the shipments. According to Boehner, the searches were "glaringly abnormal." (*Id.* at 56:16–17.) Plaintiffs fail to perceive any possible connection between the tainted shipments the FDA found in November and December 2002, and the FDA's increased inspections in 2003.

Defendants contend that they were informed by a member of Senator Feingold's staff that there was nothing he could do about Defendants' concerns. (*See* Eckes Dep. at 94:8–17.) Although Plaintiffs contend that Eckes's statement is hearsay, and the letter caused Customs to repeatedly hold and inspect their ginseng shipments, they concede in their opposition to Defendants' motion that "[i]t is not disputed that Senator Feingold took no action in response to the Ginseng Board's letter." (*See* Defs.' Mem. at 12.) Indeed, there is no evidence in the record showing that Customs either received the letter or was contacted by Senator Feingold about the letter. Moreover, there is no evidence in the record indicating that the letter was disseminated to anyone other than Senator Feingold. Boehner testified that, to the best of his knowledge, neither he, nor Mr. Fok, nor any other representative of

Springland had been contacted by anyone from Senator Feingold's office. (*See* Boehner Dep. at 63–64:3.)

## IV. The Seal Program

On June 28, 1995, GBW executed a licensing agreement with a predecessor entity of Springland known as Lee Yuen Fung Trading Company (the "agreement"). (*See* Defs. ' Mem. Ex. J.) The agreement granted Springland's predecessor a non-exclusive license to use the GBW seal on products containing ginseng grown in Wisconsin that met GBW's standards. While the initial license lasted one year, the agreement automatically renewed for subsequent one-year terms, unless terminated by either party on written notice at least ninety days before the expiration. (*See id.*) Under the agreement, Springland was obligated to provide GBW all Audit Trail Documents immediately upon GBW's request. Audit Trail Documents consist of all documents "concerned or connected with the source, production, manufacture, sale, purchase or distribution of the [Wisconsin ginseng]." (*Id.*) Fok testified at his deposition that, during 2002 and 2003, the Wisconsin ginseng market was very strong, and Plaintiffs purchased large quantities of the product to sell wholesale. (*See* Fok Dep. at 26:12–26:20.)

On February 7, 2003, Plaintiffs requested seals by faxing the requested copies of Wisconsin certificates of origin to GBW, which were issued by the Wisconsin Department of Agriculture for over 45,000 pounds of Wisconsin ginseng, purchased by Springland between October and December 2002. (*See* Boehner Dep. at 144–45, 147–50.) The letter alluded to a prior request for the seals, explicitly stating, "We are once again requesting that you supply us with the stickers as per our previous orders. If you still refuse, we demand an explanation." (*See* Boehner Dep. Ex. O.) After getting no response, Boehner re-sent the request on February 11, 2003. (*See* Boehner Dep. at 144–145, 147–50.)

On March 21, 2003, Eckes faxed a letter to Boehner informing him that GBW met the prior evening, and that the Wisconsin Department of Agriculture would not provide GBW with information on Springland's sales, which held up the issuance of the seals. The fax also requested payment of $290.00. (*See* Boehner Dep. Ex. P.) Boehner responded on March 24, 2003, by sending the requested payment, and noting that GBW is authorized to verify the legitimacy of their certificates for Wisconsin ginseng, but was not entitled to Springland's sales records. (*See id.* Ex. Q) A week later, on April 1, 2003, GBW faxed Boehner a notification saying that the seals had been sent. (*See id.* Ex. R.)

## PROCEDURAL HISTORY

Because Plaintiffs failed to comply with discovery orders issued by the Court, and failed to respond to Court correspondence, the Court issued an Order, on July 15, 2008, precluding Plaintiffs from seeking damages, and another Order, on July 30, 2008, dismissing the case with prejudice. Approximately six months later, Plaintiffs moved under Rule 60(b)(6) of the Federal Rules of Civil Procedure to vacate both Orders, claiming that their discovery failures and breakdown in communication were the result of their attorney suffering from severe psychological problems. This Court reinstated Plaintiffs' case, finding that the combination of Plaintiffs' counsel's constructive abandonment of the case, and his psychological assessment, constituted exceptional circumstances. However, since the preclusion Order resulted from both Plaintiffs' as well as their attorney's failure to produce required discovery, this Court held that Plaintiffs were still pre-

cluded from seeking special damages. (*See* Order, dated May 14, 2009, 2009 WL 1360975.)

## DISCUSSION

### I. Legal Standard for Summary Judgment

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, a motion for summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Shannon v. N.Y, City Transit Auth.,* 332 F.3d 95, 98 (2d Cir.2003). The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Once a properly supported motion for summary judgment has been submitted, the burden shifts to the non-moving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at trial. *See Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743 (2d Cir.2003); *Peck v. Pub. Serv. Mut. Ins. Co.,* 326 F.3d 330, 337 (2d Cir.2003) (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006). However, the non-moving party must put forth "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e) (2). A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party may not rely on its pleadings, mere allegations, simple denials, conclusory statements, or conjecture to create a genuine issue for trial. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. at 2514; *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is ... insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

### II. Plaintiff's Libel Claim

■ "Defamation in word or print is cognizable in an action for libel." *Thai v. Cayre Group et al.,* No. 10 Civ. 269(SAS), 726 F.Supp.2d 323, 329, 2010 WL 2710615, at *3 (S.D.N.Y. July 8, 2010) (quoting *Rosenberg v. MetLife, Inc.,* 453 F.3d 122, 123 n. 1 (2d Cir.2006)). Under New York law,[3] a plaintiff alleging defamation must show "(1) a false statement about the plaintiff; (2) published to a third party

---

3. Both parties rely on New York law in their papers, and such "implied consent ... is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir. 1989)); *see also Gutkowski v. Steinbrenner,* 680 F.Supp.2d 602, 609 n. 2 (S.D.N.Y.2010).

without authorization or privilege; (3) through the fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" *Gargiulo v. Forster & Garbus, Esqs.*, 651 F.Supp.2d 188, 192 (S.D.N.Y.2009) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 37–38, 704 N.Y.S.2d 1, 5 (1st Dep't 1999)).

■■■ Libel claims are not sustainable in the absence of special damages unless they fall into one of four exceptions, which collectively constitute "libel per se." *See Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). The four exceptions are statements that either (1) charge a plaintiff with a serious crime; (2) injure another in his or her trade, business or profession; (3) claim that a plaintiff has a loathsome disease; or (4) impute unchastity to a woman. *See Stern v. Cosby*, 645 F.Supp.2d 258, 273 (S.D.N.Y.2009) (citing *Liberman*, 80 N.Y.2d at 435, 590 N.Y.S.2d 857, 605 N.E.2d 344.) Under New York law, statements that are defamatory per se are actionable without "pleading and proof of special damages." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir.2000). While the line between statements that are defamatory per se and those that require proof of special damages is often ambiguous, a statement that "tend[s] to injure the plaintiff in his or her trade, business or profession is defamatory per se and does not require proof of special damages to be actionable." *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir.2001).

*Accord Allen v. CH Energy Group, Inc.*, 58 A.D.3d 1102, 1103, 872 N.Y.S.2d 237, 238 (3d Dep't 2009) ("While the general rule provides that a defamatory statement is not actionable absent a showing of special damages, one of the recognized exceptions to such rule is when the statement imputes incompetence, incapacity or unfitness in the performance of one's profession or trade.") (quotation marks and citations omitted).

■■■ Because Defendants' statements in the letter accuse Plaintiffs of illegally bypassing Customs inspections and question the integrity of Springland's business practices, Plaintiffs' libel claim is sustainable notwithstanding the absence of special damages.[4] Nevertheless, Defendants contend that the statements in the letter are true, and, in any event, subject to a qualified privilege.

### A. The Truthfulness of the Letter

■■■ Truth is an absolute defense to a libel action, regardless of any harm caused by the statements. *See Matovcik v. Times Beacon Record Newspapers*, 46 A.D.3d 636, 638, 849 N.Y.S.2d 75 (2d Dep't 2007); *Kamalian v. Reader's Digest Assn. Inc.*, 29 A.D.3d 527, 528, 814 N.Y.S.2d 261 (2d Dep't 2006); *Cahill v. Cnty. of Nassau*, 17 A.D.3d 497, 498, 793 N.Y.S.2d 190 (1st Dep't 2005). The defense may be relied upon even if the published statements are not literally true, or if there are minor inaccuracies, so long as the publication is "substantially true." *See Kehm v. Murtha*, 286 A.D.2d 421, 730 N.Y.S.2d 243 (2d

---

4. Because Plaintiffs failed to submit a detailed account of their damages in discovery, and are precluded from recovering special damages, any actual award stemming from the letter would most likely be nominal, particularly since there is no evidence that the letter was published to anyone but Senator Feingold. *See Meehan v. Snow*, 494 F.Supp. 690, 696 (S.D.N.Y.1980) (finding as a matter of law that compensatory damages do not imply a right to substantial damages, as substantial compensatory damages must be founded upon a finding of substantial injury), *rev'd on other grounds*, 652 F.2d 274 (2d Cir.1981); *see also Wood v. Lee*, 41 A.D.2d 730, 341 N.Y.S.2d 738 (1st Dep't 1973) (noting that it is assumed that while slander does cause some damages, they may be nominal).

Dep't 2001); *Carter v. Visconti*, 233 A.D.2d 473, 474, 650 N.Y.S.2d 32 (2d Dep't 1996). The test of whether a statement is substantially true is "whether the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Love v. Morrow & Co.*, 193 A.D.2d 586, 588, 597 N.Y.S.2d 424 (2d Dep't 1993).

■ Defendants fail to show that there is no issue of material fact concerning the truthfulness of the letter. While the letter contains elements of truth, such as the fact that Plaintiffs' ginseng was being held next to their 29th Street warehouse prior to undergoing FDA testing (*see* Boehner Dep. at 111–113), the letter also contains inaccurate information, and thus cannot be characterized as substantially true. The thrust of the letter is its implication that Jeffrey Boehner used personal connections to successfully bypass testing of Springland's ginseng imports. Defendants suggest that Boehner may have worked for Customs prior to working at Springland, and this connection allowed him to store the company's imports in a separate warehouse away from the port before they were actually tested. According to Defendants, before these segregated imports actually were tested, Springland switched the samples so that the tests were done on uncontaminated ginseng, thereby allowing unauthorized ginseng into the country. Plaintiffs emphatically deny the letter's implications, and Defendants fail to offer any evidence that would unequivocally establish their truth.

In addition, the letter suggests that Boehner may have previously worked for Customs. Boehner testified that he never worked for Customs or any other government agency. (*See* Boehner Dep. at 42.) Moreover, in the two-month period prior to Defendants sending the letter to Senator Feingold, Customs stopped two of Plaintiffs' imported shipments, directly contradicting Defendants' contention that Customs was allowing Springland's imports to circumvent the inspection and testing process. Defendants also provide no proof supporting their contention that Plaintiffs switched samples that were designated to be tested in the Springland warehouse. As a result, reasonable jurors could conclude that the statements in the letter are not substantially true.

### B. *Qualified Privilege*

■ Defendants argue that regardless of the letter's truthfulness, it is subject to a qualified privilege, and, thus, not actionable. New York recognizes a qualified privilege when a defamatory statement is made to someone who shares a common interest with the speaker in the subject matter. *See Thai*, 726 F.Supp.2d at 329–30, 2010 WL 2710615, at *3 (citing *El–Hennawy v. Davita, Inc.*, 50 A.D.3d 625, 626, 853 N.Y.S.2d 925, 925 (2d Dep't 2008)). The interest need not be of a legal nature, as it can also be of a moral or social character. *See Qureshi v. St. Barnabas Hosp. Ctr.*, 430 F.Supp.2d 279, 290–291 (S.D.N.Y.2006) (citing *Stukuls v. State*, 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977)). Courts recognize a common interest privilege in instances where "the good that may be accomplished by permitting an individual to make a defamatory statement without fear of liability outweighs the harm that may be done to the reputation of others." *Garson v. Hendlin*, 141 A.D.2d 55, 61, 532 N.Y.S.2d 776 (2d Dep't 1988). As long as the privilege is not abused, the exchange of information between parties who maintain a common interest should not be disrupted. *See Liberman*, 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344. Qualified privilege is liberally applied, as courts typically recognize one when the parties "have

such a relation to each other as would support a reasonable ground for supposing an innocent motive for imparting the information." *Anas v. Brown*, 269 A.D.2d 761, 702 N.Y.S.2d 732 (4th Dep't 2000) (citing *Garson*, 532 N.Y.S.2d at 780). New York courts have applied this standard on a case-by-case basis. *See Gay v. Carlson*, 60 F.3d 83, 88 (2d Cir.1995).

In this case, it is reasonable to conclude that GBW shared a common interest with Senator Feingold in the welfare of the Wisconsin ginseng industry and the citizen consumers of Wisconsin. Eckes and Heise are both citizens of Wisconsin and employees or members of GBW. (*See* Eckes Dep. 9–14; Heise Dep. at 9–11.) GBW is an organization concerned with the growth, sale, and use of Wisconsin ginseng, as well the welfare of the ginseng industry within Wisconsin. (*See* Defs.' 56.1 St. ¶ 3.) Senator Feingold, as a senator from Wisconsin, represents the people of the state, has an interest in assuring that they, as well as other Americans, are not being deceived as consumers; he also has an interest in the economic vitality of Wisconsin. On the Senator's home web page, he lists services that his office provides constituents, including "help with a federal agency." Under this link Senator Feingold explains that "casework is where my office works to solve a problem or a concern that an individual has with a federal agency ... my staff works with a variety of federal agencies to help constituents interact with the government." (*See* Defs.' Reply Mem. App. 1, http://feingold.senate.gov/services_fedhelp.html.)

Defendants sought help from Senator Feingold in the interest of the ginseng industry of Wisconsin. Eckes and Heise,

the authors of the letter, had little or no personal pecuniary interest in criticizing Springland. Their letter expressed concern about imports bypassing testing by federal agencies, and specifically mentioned Plaintiffs as an example of that problem. "The fact that New York Customs will not hold [Springland's] shipments to test them in port, while testing others, shows an extreme problem." (Defs.' Mem. Ex. C.)

In instances where the alleged defamatory statements serve a public or societal interest, courts are more inclined to find a qualified privilege. *Cf. Silverman v. Clark*, 35 A.D.3d 1, 11, 822 N.Y.S.2d 9 (1st Dep't 2006) (finding no qualified privilege for disparaging letters written where defendant was motivated solely by pecuniary interest).

Moreover, Defendants sent the letter solely to Senator Feingold, rather than widely disseminating it, suggesting that their motivation was to seek help from Feingold and Customs, rather than to simply damage Plaintiffs' business.[5] *See Garson v. Hendlin*, 141 A.D.2d at 63, 532 N.Y.S.2d 776 (finding a qualified privilege where "the defendant was circumspect in her publication of the letter," sending it only to the probation officer who could best address defendant's concern about the lawful protection of the children involved).

The Court finds the case at hand analogous to a case in which the Appellate Division, Second Department upheld a common interest privilege where the defendant, the chief umpire of the defendant little league organization, wrote a letter to the Director of the Huntington Department of Parks and Recreation, complaining about the foul language used by the

**5.** Indeed, Plaintiffs were buyers of Wisconsin ginseng and had a contractual relationship with GBW.

plaintiff little league coach at the conclusion of a game. *See Phelan v. Huntington Tri–Village Little League Inc.,* 57 A.D.3d 503, 504, 868 N.Y.S.2d 737 (2d Dep't 2008). The court held that the defendant was entitled to qualified privilege because the letter was sent solely to the Director, who shared a corresponding interest in the welfare of the Huntington Parks, and of the children who used them. *See id.*

Accordingly, because Defendants share a common interest with Senator Feingold, their communications with him are entitled to a qualified privilege.

### C. *Defendants' State of Mind*

Plaintiffs contend that, even if the letter is subject to a qualified privilege, Defendants acted with malice, thus destroying any asserted privilege. (*See* Pls.' Mem. at 13–14.) According to Plaintiffs, because "Springland's importation and exportation of ginseng was entirely in accord with the law, ... [o]ne must conclude, then, that defendants' motive was to harm plaintiffs' commercial interests." (*Id.* at 14.) Plaintiffs further argue that "[o]nly a private detective or an informant from inside plaintiffs' business could provide reports of [plaintiffs'] supposedly highly secretive and nefarious activity to defendants." (*Id.*) Therefore, Plaintiffs aver that Defendants' failure to identify such a source requires a conclusion that Defendants "simply made up" the statements in the letter. (*See id.*)

■ Plaintiffs' arguments are without merit. To overcome the qualified privilege, the plaintiff bears the burden of showing that the defendant acted with either common law or constitutional malice. *See Phelan,* 57 A.D.3d at 505, 868 N.Y.S.2d at 738 (citing *Liberman,* 80 N.Y.2d at 437–39, 590 N.Y.S.2d at 862–63, 605 N.E.2d 344). "Common-law malice mean[s] spite or ill will, and will defeat the privilege only if it is the one and only cause for the

publication." *Fuji Photo Film U.S.A., Inc. v. McNulty,* 669 F.Supp.2d 405, 412 (S.D.N.Y.2009) (quoting *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 98 (2d Cir.2000) (alterations in original) (citations and quotation marks omitted)); *see also Liberman,* 80 N.Y.2d at 439, 590 N.Y.S.2d at 863, 605 N.E.2d 344. "Constitutional or actual malice means publication with [a] high degree of awareness of [the publication's] probable falsity or while the defendant in fact entertained serious doubts as to the truth of [the] publication." *Konikoff,* 234 F.3d at 99.

■ As the New York Court of Appeals has observed: "There is a critical difference between not knowing whether something is true and being highly aware that it is probably false." *Liberman,* 80 N.Y.2d at 438, 590 N.Y.S.2d at 863, 605 N.E.2d 344; *see also Qureshi,* 430 F.Supp.2d at 292 (stating that evidence demonstrating that a statement is merely false is insufficient to raise a triable issue of fact as to malice) (citing *Kasachkoff v. City of New York,* 107 A.D.2d 130, 485 N.Y.S.2d 992 (1st Dep't 1985)). Allegations that a defendant could have discovered the falsity of a statement if he had conducted an adequate investigation into the facts do not establish that a defendant acted with reckless disregard for the truth. *See Hoyt v. Kaplan,* 263 A.D.2d 918, 919–20, 694 N.Y.S.2d 227, 229 (3d Dep't 1999).

■ Although a determination of whether a defendant has abused the qualified privilege is ordinarily a question of fact for the jury, "[t]he New York Court of Appeals has explicitly stated that th[is] issue ... is only a question for the jury 'where there is evidence in the case warranting [its] submission to the jury, and the burden of proof is on the plaintiff.'" *Canino v. Barclays Bank, PLC,* No. 94 Civ. 6314(SAS), 1998 WL 7219, at *5

(S.D.N.Y. Jan. 7, 1998) (quoting *Stukuls v. State*, 42 N.Y.2d 272, 279, 397 N.Y.S.2d 740, 745, 366 N.E.2d 829 (1977)). Conclusory allegations, or claims based on conjecture, are insufficient to defeat the claim of qualified privilege. *See Golden v. Stiso*, 279 A.D.2d 607, 608, 720 N.Y.S.2d 164, 164 (2d Dep't 2001); *see also Shapiro v. Health Ins. Plan of Greater New York*, 7 N.Y.2d 56, 64, 194 N.Y.S.2d 509, 515, 163 N.E.2d 333 (1959) ("It was for plaintiff to show that he had facts available to prove such malice. He produced none. Suspicion, surmise and accusation are not enough. The existence of earlier disputes between the parties is not evidence of malice.").

 Here, Plaintiffs fail to provide sufficient evidence to allow a jury to reasonably conclude that malice was the one and only cause for writing the letter to Senator Feingold. *See Golden*, 720 N.Y.S.2d at 165 (holding that to overcome the privilege, the plaintiff must show that "the communication was not made in good faith but was motivated solely by malice") (citation omitted). Plaintiffs' argument that Defendants *must* have acted with malice, because "Springland's importation and exportation of ginseng was entirely in accord with the law" (*see* Pls.' Mem. at 14), is wholly conclusory and not supported by any admissible evidence.

In any event, Defendants have established, and Plaintiffs do not dispute, that Defendants developed concerns about the importation of ginseng and specifically Springland after speaking with Customs employee Cornelia Miller, among others. (*See* Pls.' 56.1 St. ¶¶ 5–6.) And, Defendants contend that it is for this reason that they wrote the letter to Senator Feingold. Thus, no reasonable juror could conclude that Defendants were motivated *solely* by malice, when Plaintiffs concede that Defendants received information from Customs employees and other government officials about problems relating to the importation of ginseng. Accordingly, Plaintiffs cannot establish that Defendants acted with common-law malice.

In addition, that *Plaintiffs* claim the statements in the letter were false does nothing to prove *Defendants'* state of mind when writing the letter. Falsity is merely an element of libel itself, and does not establish malice. Indeed, Plaintiffs cannot show, as they must, that Defendants acted "with [a] high degree of awareness of [the letter's] probable falsity." *See Konikoff*, 234 F.3d at 99. Plaintiffs merely speculate, in conclusory fashion, that Defendants' information could have only come from a private investigator or informant, and because none was identified, the statements in the letter were "simply made up." (*See* Pls.' Mem. at 14.)

However, Eckes testified at her deposition that she based the statements in the letter on what she had learned from Cornelia Miller, as well as from individuals at "the Ag[riculture] Department, the State, Milwaukee customs, commerce, [and] customs in New York and California." (*See* Eckes Dep. at 118.) Eckes learned of information from these individuals that raised concerns about the importation of ginseng, some of which was specific to Springland. (*See, e.g., id.* at 40, 76.) Eckes also testified that she received the so-called "hot list" on a monthly basis, and that Springland was on the list. (*See id.* at 40–45, 89.)

Again, Plaintiffs do not dispute that Defendants received this information, and that it prompted their concerns, but claim that the information Defendants received was "not well-grounded." (*See* Pls.' 56.1 St. ¶¶ 5–6.) Plaintiffs, however, offer no competent evidence to support their conclusory allegation that the information given to Defendants from Customs employees

and other government officials was unsupported.[6] Yet, even if they had, this would show only that Customs employees (or other government officials) may have made statements to Defendants with reckless disregard for the truth, not that Defendants wrote the letter with constitutional malice.[7]

Because there is no evidence that Defendants had reason to know that what they said in the letter about Springland was false, and no evidence indicating that the sole reason they wrote the letter was to injure Plaintiffs, no reasonable jury could conclude that Defendants acted with common-law or constitutional malice, so as to overcome the qualified privilege. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' libel claim.[8] *See Liberman*, 80 N.Y.2d at 438–39, 590 N.Y.S.2d at 863, 605 N.E.2d 344 (court finds no triable issue on malice because there was no evidence in the record indicating that the defendants were highly aware that their statements were probably false or that there was no purpose to the letter other than to injure the plaintiffs).

### III. Plaintiffs' Tortious Interference Claims

Plaintiffs assert claims for tortious interference with economic relations and tortious interference with prospective business relations. Plaintiffs contend that Defendants' letter resulted in Customs stripping and holding containers filled with ginseng, which, in turn, prevented Plaintiffs from fulfilling supply contracts with existing customers. Plaintiffs appear to further contend that Defendants caused Wisconsin ginseng growers to refuse to sell Wisconsin ginseng to them.

#### A. *Tortious Interference with Economic Relations*

Under New York law, the elements of tortious interference with economic relations are "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir.2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)).

Plaintiffs' tortious interference with economic relations claim fails as a matter of law. Plaintiffs contend that they had contracts to supply ginseng to various customers and, as a result of Customs' delaying ginseng shipments for inspection, the customers cancelled their orders. Accepting as true Plaintiffs' contention that these contracts existed, and drawing every inference in Plaintiffs' favor, there are no dis-

---

**6.** Plaintiffs' argument that Defendants were "objectively reckless" to equate Plaintiff Jeffrey Boehner with former Customs Commissioner Robert C. Bonner based upon "a few letters in their last names" is without merit. As an initial matter, Defendants wrote that "[s]upposedly" Boehner had previously worked for Customs; this is not an unequivocal statement of fact. Further, when Defendants wrote the letter to Senator Feingold, they referred to "Jeffrey Boehner" as "Jeffrey Bonner," and were clearly mistaken as to the correct spelling of his last name.

**7.** Defendants' alleged failure to investigate the truth of these statements does not, as a matter of law, show recklessness. *See Hoyt*, 263 A.D.2d at 919–20, 694 N.Y.S.2d at 229.

**8.** In their submissions, both parties addressed the issue of whether Defendants' letter was protected by the right to petition the government for redress of grievances. Because the Court has concluded that Defendants' letter was protected by the common interest privilege, there is no need to address the issue.

puted issues of material fact regarding the other elements of the claim. Plaintiffs fail to offer any evidence that suggests Defendants knew of any contracts that Plaintiffs had with their customers.[9] Simply stating, as Plaintiffs do here, that Defendants knew that Plaintiffs regularly received ginseng shipments in order to sell wholesale is insufficient. *See Advanced Mktg. Group, Inc. v. Bus. Payment Sys., LLC,* 300 Fed.Appx. 48, 50 (2d Cir.2008) (dismissing tortious interference claim where complaint failed to allege defendant's knowledge of actual contract that was alleged to have been breached); *Medtech Prods. Inc. v. Ranir, LLC,* 596 F.Supp.2d 778, 813 (S.D.N.Y.2008) ("New York law is clear on its requirement that a defendant charged with tortiously interfering with a contractual relationship have actual knowledge of the breached contract.") (citing *Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354, 359 (S.D.N.Y.2001)). "[T]o avoid dismissal of a tortious interference with contract claim a plaintiff must support his claim with more than mere speculation." *Burrowes v. Combs,* 25 A.D.3d 370, 373, 808 N.Y.S.2d 50, 53 (1st Dep't 2006).

In addition, Plaintiffs fail to show how Defendants intentionally interfered with the performance of an existing contract. To satisfy the third prong of the test, Plaintiffs must show Defendants' direct interference with a contract. That is, Defendants must have directed some activities toward the customers whose contracts are alleged to have been breached. *See G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 767–68 (2d Cir.1995) (affirming dismissal of tortious interference claim where plaintiff failed to show that the defendant had the intent to secure the breach of a specific contract); *B & M Linen Corp. v. Kannegiesser USA, Corp.,* 679 F.Supp.2d 474, 485 (S.D.N.Y.2010) ("[T]he defendant's interference must be direct: the defendant must direct some activities towards the third party. . . .") (internal quotation marks and citations omitted); *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 481 (S.D.N.Y.1997) ("in order to establish a claim under the tort of interference with contractual relations, a third party must breach the contract after being induced to do so by the defendant"); *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 363–64, 818 N.E.2d 1100 (2004) ("the economic pressure that must be shown is not . . . pressure on the [plaintiffs], but on the [plaintiffs'] customers. As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."); *Vigoda v. DCA Prods. Plus Inc.,* 293 A.D.2d 265, 266, 741 N.Y.S.2d 20, 23 (1st Dep't 2002) (to establish a claim of tortious interference with contract a plaintiff must show the defendant's intentional procurement of the third party's breach).

■ Because there is no evidence that Defendants' knew of any specific contracts that Plaintiffs had with their customers, or directed any action at those customers in order to secure a breach of their contracts with Plaintiffs, no reasonable jury could conclude that, by writing to Senator Feingold about a matter of concern to them, even if that writing contained falsehoods, Defendants tortiously interfered with Plaintiffs' economic relations with their

---

**9.** Curiously, Plaintiffs deemed these agreements "Attorneys Eyes Only," yet, in order to maintain a claim for tortious interference with economic relations, Plaintiffs must point to the existence of a valid contract with a third party that was known to Defendants.

customers. Therefore, Defendants are entitled to summary judgment on this claim.

### B. *Tortious Interference with Prospective Economic Relations*

■■■■ Plaintiffs' tortious interference with prospective economic relations claim fares no better. A defendant is liable for tortious interference with prospective economic relations when "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Five Star Dev. Resort Cmtys., LLC v. iStar RC Paradise Valley LLC,* No. 09 Civ. 2085(LTS), 2010 WL 2697137, at *4 (S.D.N.Y. July 6, 2010) (quoting *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997)). The New York Court of Appeals has stated that because "[g]reater protection is accorded an interest in an existing contract ... than to the less substantive, more speculative interest in a prospective relationship[,] ... liability will be imposed only on proof of more culpable conduct on the part of the interferer" under a tortious interference with a prospective business relationship claim. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 633, 406 N.E.2d 445 (1980); *accord Medtech Prods. Inc.,* 596 F.Supp.2d at 815. Typically, unless the "defendant engaged in conduct for the sole purpose of inflicting intentional harm on plaintiffs," a defendant's actions must amount to a crime or an independent tort, such as fraud or misrepresentation. *Carvel Corp.,* 3 N.Y.3d at 190–91, 785 N.Y.S.2d at 359, 818 N.E.2d 1100. Mere persuasion directed at interfering with a prospective contract is insufficient. *See Scutti Enterps. v. Park Place Entm't*

*Corp.,* 322 F.3d 211, 216 (2d Cir.2003). Moreover, "mere suspicions are inadequate to support a claim for tortious interference with business relations." *Id.* at 216.

■■■ Plaintiffs claim that, because of Defendants' conduct, Wisconsin ginseng sellers refused to sell ginseng to them in 2003. Yet, they point to no competent evidence of (1) prospective business relationships of which Defendants were aware; (2) improper conduct by Defendants, on the level of a crime or independent tort, such as fraud, directed to those prospective business relations in an effort to disrupt a prospective contract; or (3) actual injury to a business relationship.

As an initial matter, Plaintiffs' opposition to Defendants' motion fails to point to any evidence to support this claim. Although their Memorandum of Law in Opposition to the motion cites to certain pages in Mr. Fok's deposition, those pages do not contain any evidence of tortious interference. (*See* Pls.' Mem. at 17.) Moreover, Defendants asserted in their Rule 56.1 Statement that they did not interfere with Plaintiffs' prospective contractual relationships, citing to Ms. Eckes's deposition testimony that she never contacted individuals telling them not to do business with Plaintiffs, and specifically, did not tell any ginseng sellers not to sell to Plaintiffs. (*See* Defs.' 56.1 St. ¶ 21 & Ex. M ¶ 8.) In response, Plaintiffs merely asserted that the statement is a legal conclusion, not an undisputed fact, and pointed to no evidence in the record which would create a material issue of fact on the issue. (*See* Pls.' 56.1. St. ¶ 21.) The Court was thus left to comb the record for any support for Plaintiffs' claim.

There was, in fact, some testimony by Mr. Fok suggesting that he was thwarted in purchasing ginseng from three different

Wisconsin growers.[10] Fok's testimony was that three growers told him that they had heard rumors about the letter to Senator Feingold, and they did not want to sell to him. (*See* Affidavit of Patrick S. Murphy, Esq., dated Mar. 29, 2010 ("Murphy Aff."), ¶ 62.) On its face, this testimony is woefully inadequate to support a claim for tortious interference with prospective economic relations.

First, any testimony about what a ginseng seller purportedly said to Mr. Fok is hearsay, and thus not competent evidence. *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir.2004) ("an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial"); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357 (2d Cir.1997) (report that is hearsay cannot create a triable issue of fact). In addition, Plaintiffs offer no evidence indicating that it was Defendants who told the sellers about the letter; indeed, Mr. Fok's testimony is that the sellers claimed to have heard rumors about the letter. Finally, barrels could not be unsealed. Plaintiffs do not know why they could not be opened, or whether the ginseng in the barrels had already been sold. No mention was made of Defendants at any time during this incident. Yet, from this, Plaintiffs ask the Court and a prospective jury to infer that the seller had been improperly induced by Defendants to refuse to sell ginseng to Fok. This is sheer speculation and fails to create a material issue of fact. Moreover, there is no evidence that even if Fok had been allowed to see the ginseng, that it is likely he would have purchased it. No terms of such a sale had been discussed and there is no evidence that terms were

likely to have been agreed upon. Indeed, when pressed, Fok testified that he had not bought ginseng from that seller for at least several years prior to his visit in 2003. For example, in 2002 he refused to buy from this seller because the price was not right. (*See* Murphy Aff. ¶¶ 63–64.)

With respect to a second ginseng seller, Fok testified that, in the fall of 2003, he refused to sell ginseng to him because he had heard "all of these bad things about [him] from the Ginseng Board of Wisconsin." (Murphy Aff. ¶ 67.) The seller never said what bad things he heard. (*See id.*) Leaving aside that this is rank hearsay, and assuming it to be true, no reasonable juror could conclude that Plaintiffs satisfy the elements of tortious interference with prospective economic relations merely by showing that Defendants said bad things about them. Saying unspecified "bad" things about someone is not an independent crime or tort, and does not constitute extreme and unfair economic pressure. *See Williams v. Citigroup, Inc.*, No. 08 Civ. 9208(LAP), 2009 WL 3682536, at *9 (S.D.N.Y. Nov. 2, 2009) (pleading the dissemination of false statements alone is not enough to support a claim for tortious interference, and acting in one's own economic interest is not malice); *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp.2d 507, 523 (S.D.N.Y.2009) ("[T]he second element requires the plaintiff to demonstrate direct interference with a third party, that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff."). Indeed, there is no evidence that Defendants even knew that the seller had sold ginseng to Plaintiffs in the past, or intended to do so in the future. Fok

---

10. One would think that Plaintiffs would have pointed to and provided that testimony to the Court. They did not. It is Defendants who have described some of the testimony, but, because Plaintiffs deemed it confidential, it was not provided to the Court.

could not even recall purchasing ginseng from this seller in any of the preceding five years. (*See* Murphy Aff. ¶ 69.)

As for the purported third seller of ginseng, Fok never even approached him in an effort to purchase ginseng. He merely claims that the first seller told him that the third seller would not sell ginseng to him. (*See id.* ¶ 73.) There is no evidence that seller three was improperly influenced, coerced, or even approached in any way by Defendants, in an effort to keep him from selling to Plaintiffs. *See Five Star Dev.*, 2010 WL 2697137, at *4 ("It is clear ... that under New York law, in order for a party to make out a claim for tortious interference with prospective economic [relations], the defendant must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party.") (quoting *Fonar*, 957 F.Supp. at 482 (S.D.N.Y.1997)); *Randolph Equities*, 648 F.Supp.2d at 523 (same). Moreover, Fok testified that he only saw this seller occasionally, not every year, and he could not recall buying ginseng from him in the years between 2000 and 2009. (*See id.*) It can hardly be said that they had a business relationship. *See Vigoda*, 293 A.D.2d at 266, 741 N.Y.S.2d at 23 ("Tortious interference with prospective economic relations requires an allegation that plaintiff would have entered into an economic relationship but for the defendant's wrongful conduct."). Thus, the hearsay relating to seller three, even if accepted as true, does not show intentional interference by Defendants with a *bona fide* business relationship between Plaintiffs and seller three.

In sum, Plaintiffs' claim is based on pure speculation and inadmissible hearsay. Because no reasonable jury could conclude that Defendants tortiously interfered with Plaintiffs' prospective economic relations, Defendants are entitled to summary judgment on the claim.[11]

## IV. Plaintiffs' Breach of Contract Claim

 Under New York law, in order for a plaintiff to state a breach of contract claim, he must show "(1) the existence of an agreement, (2) adequate performance of the contract by the [claimant], (3) breach of contract by the [accused], and (4) damages." *Fuji Photo*, 669 F.Supp.2d at 412 (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir.2004) (quotation marks omitted)). Conclusory allegations that a defendant breached a contract are insufficient to support a breach of contract claim. *See Berman v. Sugo LLC*, 580 F.Supp.2d 191, 202 (S.D.N.Y.2008).

Plaintiffs claim that GBW breached the "Certification Mark Agreement" that required GBW to supply official seals to Springland to place on its ginseng products to connote that the ginseng was certified by GBW. Specifically, Springland requested seals in a fax sent by Boehner on February 7, 2003, but Plaintiffs did not receive them until April 1, 2003. In between the request and delivery of the seals, Boehner and Eckes exchanged letters in which GBW acknowledged that it had sought Springland's sales information from the Wisconsin Department of Agriculture, and requested payment of $290.00 for the seals. After Boehner sent the requested money, and notified Eckes that GBW was not entitled to request sales information from a third party under the Agreement, GBW sent the seals. Plain-

---

**11.** Because Defendants have established that there is woefully inadequate evidence to support Plaintiffs' tortious interference claims, the Court need not address Defendants' contention that the claims are also barred by the Noerr–Pennington doctrine.

tiffs countered that Defendants breached the Agreement by delaying delivery of the seals, which postponed sale of their Wisconsin ginseng and resulted in lost revenue. (*See* Fok Dep. at 69; Boehner Dep. at 145.)

Under New York law, a plaintiff must allege the specific provisions within a contract upon which the breach of contract claim is based. *See Sheridan v. Trustees of Columbia Univ. in City of New York,* 296 A.D.2d 314, 315, 745 N.Y.S.2d 18 (1st Dep't 2002); *Matter of Sud v. Sud,* 211 A.D.2d 423, 424, 621 N.Y.S.2d 37 (1st Dep't 1995). Here, Plaintiffs' claim is predicated upon the "dilatory and slothful manner," (*see* Pls.' Mem. at 21), in which Defendants allegedly supplied the seals; however, Plaintiffs fail to cite a specific provision within the Agreement upon which the claim is based. Indeed, the Agreement is silent about the time in which GBW was required to deliver the seals to Springland.

"When a contract does not specify time of performance, the law implies a reasonable time." *Schwartz v. Rosenberg,* 67 A.D.3d 770, 771, 889 N.Y.S.2d 90, 91 (2009) (quoting *Savasta v. 470 Newport Assoc.,* 82 N.Y.2d 763, 765, 603 N.Y.S.2d 821, 623 N.E.2d 1171 (1993)); *see also Flight Sci. Inc. v. Cathay Pacific Airways Ltd.,* 647 F.Supp.2d 285, 288 n. 3 (S.D.N.Y. 2009). What constitutes a reasonable time for performance depends on the facts and circumstances of the particular case, including the subject matter of the contract, the situation of the parties, their intention, what they contemplated at the time the contract was made, and the circumstances surrounding performance. *See Teramo & Co., Inc. v. O'Brien Sheipe Funeral Home, Inc.,* 283 A.D.2d 635, 636, 725 N.Y.S.2d 87,

89 (2d Dep't 2001) (citing *Savasta,* 82 N.Y.2d at 765, 603 N.Y.S.2d 821, 623 N.E.2d 1171). Ordinarily the question of what is a reasonable time is one for a jury unless the facts are undisputed. *See Miller v. Moore,* 68 A.D.3d 1325, 1327, 890 N.Y.S.2d 712, 714 (3d Dep't 2009); *Silbermann v. Citibank, N.A.,* 195 A.D.2d 272, 274–75, 599 N.Y.S.2d 588 (1st Dep't 1993); *Towl v. Estate of Block,* 145 Misc.2d 433, 436, 546 N.Y.S.2d 924, 926 (Sup.Ct., Erie Cnty.1989) (citing 22 N.Y.Jur.2d *Contracts* § 245).

In this case, approximately two months elapsed between Plaintiffs' request for the seals and Defendants' provision of the seals. During this period, Defendants requested payment, and within a week of being notified of the payment, GBW sent the seals. Yet, it is unclear from the record before the Court whether the delay in providing the seals was the result of a failure to make payment. In addition, while it was not within GBW's rights to ask the Wisconsin Department of Agriculture for sales records, under section 7 of the Agreement, GBW was entitled to request from Springland "all documents concerned or connected with the source, production, manufacture, *sale,* purchase or distribution of [Wisconsin grown ginseng]." (Defs.' Mem. Ex. J.) (emphasis added). It is also unclear if Springland's unresponsiveness is being asserted as a justification for the delay. Since the reasonableness of the delay is a question of fact, the Court will let a jury determine if, given the recited facts, GBW breached the Certified Mark Agreement by delivering the seals approximately two months after they were requested by Springland.[12]

---

12. Defendants do not argue that Plaintiffs' breach of contract claim should be dismissed for failure to state what damages they suffered. Nevertheless, the Court wonders what damages Plaintiffs could establish for the approximately two-month delay from the initial request and the time the seals were delivered.

Nevertheless, insofar as Plaintiffs assert a breach of contract claim against the individual Defendants—Eckes and Heise—those claims are dismissed, as they are not parties to the Agreement.

## CONCLUSION

For the reasons set forth above, the Court grants in part Defendants' motion for summary judgment. Accordingly, Plaintiffs' claims for libel, tortious interference with economic relations, tortious interference with prospective business relations, and breach of contract as against Defendants Eckes and Heise, are dismissed; Plaintiffs' breach of contract claim against GBW may proceed to trial.

SO ORDERED.