**NES FINANCIAL CORP., Plaintiff,**

v.

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, Defendant.**

**No. 11 Civ. 3437(VM).**

United States District Court, S.D. New York.

Nov. 28, 2012.

David Philip Jang, Joel Maximino Melendez, Justin Michael Ellis, Robert Kelsey Kry, Steven Francis Molo, MoloLamken, LLP, New York, NY, for Plaintiff.

John Morgan Callagy, Damon William Suden, David I. Zalman, Melissa Errine Byroade, Kelley Drye & Warren, LLP, New York, NY, for Defendant.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiff NES Financial Corp. ("NESF") brought this action against defendant JPMorgan Chase Bank, National Association ("JPMorgan") alleging a variety of claims stemming from the acquisition by NESF of J.P. Morgan Property Exchange Inc. ("JPEX")—JPMorgan's Section 1031 like-kind exchange business. The Court conducted a bench trial on September 19, 20, 24–25, 27–28, October 1, and November 8, 2012 to adjudicate NESF's claims.

The Court now sets forth its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT [1]

#### A. SECTION 1031 LIKE–KIND EXCHANGES

Under Section 1031 of the Internal Revenue Code ("IRC"), 26 U.S.C. § 1031 ("Section 1031"), a taxpayer may defer recognition of a gain from the sale of investment property by engaging in a "like-kind exchange," a transaction in which a taxpayer uses the proceeds from a present sale to subsequently purchase other property that is similar or "like-kind" in nature. In order to qualify for tax deferral under Section 1031, the taxpayer must meet certain requirements. Among other things, these requirements include: (1) the taxpayer must identify the replacement property within 45 days of the sale of the existing property; (2) the replacement

property must actually be acquired within 180 days from the transfer of the relinquished property; (3) the taxpayer cannot have actual or constructive receipt of the proceeds from the relinquished property during the exchange period; and (4) the person transferring the relinquished property cannot be an agent of the taxpayer. *See* 26 U.S.C. § 1031.

The Treasury Regulations promulgated under Section 1031 include a "safe harbor" provision according to which a taxpayer may use a "qualified intermediary" ("QI") to facilitate a like-kind exchange in order to ensure tax deferral and avoid complications, including issues of actual and constructive receipt. *See* Treas. Reg. § 1.1031(k)–1(g)(4). In order to use this safe harbor, (1) the taxpayer must enter into a written agreement with the proposed QI; (2) the intermediary must not be a "disqualified person," which is a defined term in the regulations; (3) the intermediary, pursuant to the exchange agreement, must acquire the relinquished property from the taxpayer and subsequently transfer it to a third party purchaser, and acquire replacement property from a third party seller and transfer it to the taxpayer; and (4) the exchange agreement must provide that the taxpayer "has no rights to receive, pledge, borrow, or otherwise obtain the benefits of money or other property [generated by the sale of property] before the end of the exchange period." *Id.*

#### B. NESF'S PURCHASE OF JPEX

NESF was founded in 2005 by Michael Halloran ("Halloran"), its president and chief executive officer, to provide technology solutions to financial services compa-

---

1. While the Court has reviewed and considered all of the live testimony and accompanying exhibits admitted in evidence in connection with the trial in this matter, the Court addresses only those portions of the evidence relevant to its findings of fact and legal conclusions.

nies, including QI services for Section 1031 tax-deferred like-kind exchanges. In 2008, NESF decided to expand its presence in the QI market through the acquisition of JPEX from JPMorgan. JPMorgan had acquired the company—formerly known as APEX Property Exchange, Inc. ("APEX")—from Michael and David Marcus in April 2002.

### 1. *Due Diligence Process*

In May 2008, JPMorgan and NESF met in New York and began discussions regarding a potential acquisition of JPEX by NESF. During the bidding process, NESF conducted due diligence into JPEX. On or about May 29, 2008, NESF sent its first request for due diligence materials to JPMorgan. (Pl.'s Ex. 13.) Among other things, NESF requested a list of "significant losses/mistakes JPEX has made on an exchange." (Pl.'s Ex. 13.) JPMorgan responded that there were "no significant losses or mistakes to report." (Pl.'s Ex. 305.) NESF also requested a list of "significant outstanding/potential litigation." (Pl.'s Ex. 13.) JPMorgan responded that it was "not aware of any other litigation" aside from two lawsuits with the former owners of APEX that were settled in 2007. (Pl.'s Ex. 306.)

On June 26, 2008, NESF and JPMorgan held a due diligence meeting in Boston. (*See* Def.'s Ex. 91.) JPEX's senior personnel were present at the meeting, including its in-house counsel, Bill Lopriore ("Lopriore"), its client service manager, Dawn Shuster ("Shuster"), its controller, Kristen West, and the head of sales, Patrick McCloskey ("McCloskey"). Kate Gallivan ("Gallivan"), who had previously worked at JPEX, and had become an employee of JPMorgan, also attended the meeting. JPMorgan employee Jason Orben, who had previously served as JPEX's president, also attended. Halloran and Dan Yoder attended the management meeting for NESF. Kelly Alton ("Alton"), the gen-

eral counsel of NESF, did not attend the meeting.

Among other issues discussed at that meeting, NESF asked McCloskey about JPEX's client base and the source of business. The parties disagree over the precise language used and the nature of the response in this connection. NESF claims that Gallivan responded to a question about the source of business by stating that most JPEX clients were either external non-bank referrals or APEX legacy clients, and that JPEX did not derive much business from JPMorgan bank referrals. At trial, Gallivan testified that she was asked about JPEX's largest clients and whether NESF "would have any trouble without the JPMorgan brand name selling business." (Trial Tr. 1083.) Gallivan further testified that a number of the largest JPEX clients were heritage APEX clients prior to JPMorgan's acquisition of the business and she informed NESF that, for these large clients, this was "ongoing business that [NESF] could expect to continue." (*Id.*) Furthermore, Gallivan thought the JPEX employees had client relationships she believed would continue and that NESF would be able to sell its services without the JPMorgan brand name. (Trial Tr. 1084.)

Regardless of Gallivan's exact response at the meeting, it is undisputed that following this meeting Gallivan collected and posted the source of new business statistics for 2008 to an electronic data room which was available for NESF to review. (*See* Def.'s Ex. 97; Trial Tr. 1086–88.) The statistics displayed that JPMorgan banker referrals had been the source of 52 percent of JPEX's transactions that had closed by that point in 2008. Therefore, NESF was at least on notice prior to the acquisition of JPEX that a large quantity of business referrals came from internal JPMorgan bankers.

At no point during this meeting did the parties discuss JPEX's compliance with IRS regulations, the issue of potential disqualification of any JPEX transaction, or alleged instances of actual and constructive receipt of Section 1031 exchange funds by JPEX clients.

### 2. *Share Purchase Agreement*

On October 31, 2008, NESF entered into a share purchase agreement (the "Share Purchase Agreement") with JPMorgan to acquire all of the shares of JPEX and related entities for the contract price of $8 million minus certain adjustments. (Pl.'s Ex. 543.) The sale of JPEX closed on or about November 5, 2008. As part of the Share Purchase Agreement, JPMorgan made various representations and warranties regarding JPEX that are at issue in this case. Article 8 of the Share Purchase Agreement provides that JPMorgan will indemnify NESF for any liabilities arising out of, among other things, "[a]ny material breach of the representation or warranties made by JPMorgan" in the Share Purchase Agreement. (*Id.*) Article 8 further provides that these indemnification procedures are the "sole and exclusive" remedy and provides a $3 million cap for breach of contract damages. (*Id.*)

Under Section 3.7 of the Share Purchase Agreement, JPMorgan represented that JPEX has no undisclosed "[l]iabilities or obligations of any nature, whether absolute, accrued, contingent or other and whether due or to become due that would be required to be reflected or reserved against on a balance sheet or related footnotes of [JPEX] prepared in accordance with GAAP." (*Id.*)

Under Section 3.9 of the Share Purchase Agreement, JPMorgan represented that, to its knowledge, "no event has occurred or facts exist that may reasonably give rise to, or would serve as a basis for, commencement of any Action by or against any of the Companies or JPMorgan." (*Id.*) In the disclosure schedule to Section 3.9, JPMorgan represented that "[t]here is no pending or threatened material litigation against any of the Companies." (*Id.*)

Under Section 3.10(a) of the Share Purchase Agreement, JPMorgan represented that "[e]ach of the Companies and JPMorgan . . . have each complied and are in compliance in all material respects with all Laws applicable to them and the Business, and to JPMorgan's knowledge no material violations of Law exists." (*Id.*) JPMorgan also represented under Section 3.10(a) that "no reasonable basis or bases exists for any threatened investigation or disciplinary proceeding against any of the Companies relating to the Business that could lead to an order or action suspending, restricting, or disqualifying the continued performance of the Business in any material respect." (*Id.*)

NESF claims that JPMorgan breached these representations and warranties by failing to disclose the alleged actual receipt, constructive receipt, and potential disqualification incidents at issue in this case. Although NESF did propose specific representations, such as Section 3.10(d) relating to Treasury Regulation § 1.468B–6, NESF did not ask JPMorgan to make any representations relating to compliance with other IRS regulations, the issue of disqualification, or instances of actual and constructive receipt of like-kind exchange funds. In fact, NESF does not appear to have raised these issues—which serve as the foundation for a significant portion of NESF's claims in this action—at any point during its due diligence process.

### C. *FAILURE TO DISCLOSE TAX LIABILITIES*

NESF claims that JPMorgan's failure to disclose (1) various alleged instances of actual and constructive receipt of Section

1031 exchange funds and (2) the substantial risk that JPEX was disqualified as a QI, has subjected NESF to extensive damages including "billions of dollars of potential tax liabilities," $8.7 million dollars in lost profits, and an impairment in the overall value of NESF of at least $16.1 million. (Pl.'s Ex. 639.)

### 1. Issues Relating to Actual and Constructive Receipt

The Treasury Regulations prohibit a taxpayer from being in actual or constructive receipt of the relevant funds in order to receive a Section 1031 like-kind exchange tax-credit. *See* Treas. Reg. § 1.1031(k)–1(f)(2). A taxpayer that properly employs a QI in accordance with the safe harbor provisions of Treasury Regulations § 1.1031(k)–1(g)(4), (g)(6) is deemed not to be in actual or constructive receipt of like-kind exchange funds. To qualify for this safe harbor provision, (1) the exchanger and QI must enter into an exchange agreement; (2) the exchange agreement must limit the exchanger's rights to receive, pledge, borrow, or otherwise obtain the benefits of money held by the QI (these restrictions are known as the "(g)(6) Restrictions"); (3) the QI must not be a disqualified person; and (4) the QI must facilitate the like-kind exchange. *See* Treas. Reg. § 1.1031–1(g)(4)(i)(iii), (g)(6).

NESF claims that JPMorgan and/or JPEX failed to comply with the (g)(6) Restrictions on multiple occasions, leading to the actual or constructive receipt of like-kind exchange funds by JPEX clients.[2] NESF argues that these instances of actual and constructive receipt could lead to the Internal Revenue Service ("IRS") investigating and voiding these transactions,

thereby producing billions of dollars in potential liability for NESF. For these reasons, NESF claims JPMorgan should have disclosed these incidents pursuant to sections 3.7, 3.9, and 3.10(a) of the Share Purchase Agreement.

While individuals at JPMorgan were aware of the various instances involving alleged actual or constructive receipt, the evidence indicates they did not believe these were significant mistakes that might lead to substantial potential liabilities. (*See, e.g.,* Trial Tr. 586–87.) Indeed, NESF has offered no evidence that the IRS has investigated any of the specific JPEX transactions at issue in this case, much less that the IRS has actually voided a JPEX transaction for failure to comply with the (g)(6) Restrictions. NESF has also provided no evidence of any threatened litigation by JPEX clients related to any instances of the actual or constructive receipt of like-kind exchange funds at issue here.

In addition to the lack of any threatened actions by either the IRS or JPEX clients, the Court is persuaded that most of the alleged occurrences of actual or constructive receipt of like-kind exchange funds are attributable to decisions made by individual clients rather than JPEX personnel. For example, following discussions with their independent tax advisors, certain clients such as Cendant and General Electric ("GE"), on advice of their own tax representatives, insisted on structuring their accounts in a manner that lacked the stringent control mechanisms that JPEX officials stated were typical for standard JPEX accounts. (*See, e.g.,* Trial Tr. 432–33, 345–46, 515–18, 908–9.) According to

---

**2.** While NESF claims all JPEX clients "potentially had constructive receipt" of funds, NESF specifically alleges that, at the least, the following clients were in actual or constructive receipt at some point in time: Wells Fargo, General Electric, James Deleeuw

and/or JAD Realty, BMW, Porsche, Volkswagen, 125 Church Street, Honda, Nissan, Cendant, SunTrust, Caterpillar, M & T Bank, Celadon, Holt Rental Services, Donlen, Hann, Enterprise, and Holt of Texas. (Def.'s Ex. 123.)

JPEX witnesses, these clients insisted on such account structures despite JPEX's warnings that these client-devised structures presented risks of actual or constructive receipt of like-kind exchange funds. JPEX officials further testified that, in other instances, clients took actions in direct contravention of their contractual obligations which incorporated the (g)(6) Restrictions and thereby prohibited clients from accessing funds without the prior approval of the QI. (*See, e.g.,* Trial Tr. 542; Def's Ex. 8; Pl.'s Ex. 212.)

The Court finds that a long and extremely attenuated chain of contingent events would have to transpire before JPEX could be subjected to any potential liability for these alleged instances of actual or constructive receipt of like-kind exchange funds. To make a reasonable determination of potential liability under these circumstances, one would have to conclude that these incidents, which occurred at least four (some almost ten) years ago and prior to NESF's acquisition of JPEX in 2008, (1) would trigger an IRS investigation of a JPEX client Section 1031 exchange, (2) which would subsequently lead to the disallowance of a JPEX client's like-kind exchange transaction, (3) which would ultimately prompt a lawsuit by a client against JPEX or NESF, (4) which would have a reasonable likelihood of success, (5) which would overcome the strong defense JPEX would have regarding the clients' own roles in causing the alleged actual or constructive receipt of like-kind exchange funds. In fact, the Generally Accepted Accounting Principles ("GAAP") set forth by the Financial Accounting Standards Board only require the disclosure of "a loss contingency involving an unasserted claim or assessment if" (1) it is "probable that a claim will be asserted" and (2) "[t]here is a reasonable possibility that the outcome will be unfavorable." (Def.'s Ex. 1402, ASC 450–20–50–6.) The Court is not persuaded that under these circumstances, in which there has been no actual or threatened IRS investigation or any JPEX client actual or threatened lawsuit relating to any of the alleged instances of actual or constructive receipt of like-kind exchange funds at issue here, it would have been reasonable for JPMorgan to conclude, as NESF claims, that there was "pending or threatened material litigation" against JPEX that should have been disclosed to NESF because either (1) a claim was probable of assertion, or (2) if a claim were asserted, it possessed a reasonable likelihood of success. Not even the most prescient and pessimistic oracles of classical tragedy would possess the keen vision of the future to link together such a long chain of remote contingencies to reach such a dire prediction.

## 2. *"Routine Financial Services" and Disqualification Issues*

Under Treasury Regulation § 1.1031(k)–1(k), a QI must also not be a "disqualified person," which is defined as, among other things, someone who has acted as an agent for the taxpayer within two years of the like-kind exchange. *See* Treas. Reg. § 1.1031(k)–1(k). The regulations specifically provide that the IRS will not consider the provision of "routine financial services" by a financial institution that owns the QI as a consideration in determining whether an agency relationship exists. *Id.* However, as both parties concede, the regulations do not define "routine financial services" or provide any other guidance on the meaning of the term either in the notice of proposed rulemaking or in the final rule.

Over a period of several years, JPMorgan and/or JPEX hired a number of reputable experts as tax consultants in an attempt to obtain guidance on the meaning of "routine financial services." JPEX and/or JPMorgan consulted PricewaterhouseCoopers ("PwC") to prepare a re-

quest for a pre-submission meeting with the IRS to discuss the meaning of the "routine financial services" exception. JPEX and/or JPMorgan also retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps") for several years to research and propose changes to the regulations or obtain other guidance to reduce ambiguities regarding the meaning of "routine financial services." Finally, JPEX and/or JPMorgan sought to hire Deloitte Tax LLP ("Deloitte") to prepare a request for a private letter ruling seeking clarification on the meaning of "routine financial services." On this occasion, JPMorgan submitted a proposal to the IRS suggesting a definition of "routine financial services" to coincide with the entire scope of services that financial institutions regulated by the Comptroller of the Currency are authorized to provide. While during the course of these efforts IRS officials responded informally that JPMorgan's proposal was too broad, they did not offer further guidance. (*See, e.g.,* Trial Tr. 1072–74) Ultimately, JPMorgan and JPEX abandoned these initiatives without obtaining clarity from the IRS.

NESF alleges that JPMorgan should have disclosed "the substantial risk that JPEX was disqualified as a qualified intermediary due to JPMorgan's provision of non-routine financial services." NESF's allegation blurs a critical distinction between the disqualification of an *institution* to provide services as a QI, and the disqualification of a like—kind exchange *transaction* arranged by a QI on behalf of a client. The Court finds no evidence that, in reality, a risk existed that JPEX would be *completely* disqualified to serve as a QI—especially after its sale to NESF and subsequent disassociation from a large financial institution providing a broad range of financial services. Any disqualification finding by the IRS would necessarily depend on an individualized determination that JPMorgan provided non-routine fi-

nancial services to a specific existing bank client for which, on a specific occasion, JPEX had also arranged a specific like-kind exchange transaction. Thus, the salient risk was that the IRS might determine JPEX was a disqualified person for a particular transaction with a particular client undertaken during JPMorgan's ownership of JPEX—not that JPEX would be disqualified as a QI altogether. Therefore, the only way to analyze any reasonable risk of disqualification that JPMorgan would have been obligated to disclose under the representations of the Share Purchase Agreement would be to conduct a client-by-client analysis of the specific financial services JPMorgan provided to each of the approximately 160 clients for which NESF claims JPEX had served as a QI and whose Section 1031 transactions and potential liabilities NESF acquired.

However, absent reliable guidance from the IRS on the meaning of "routine financial services," a client-by-client analysis of the specific financial services JPMorgan provided to particular clients and whether or not such services were "routine" would be little more than speculation and guesswork—an exercise in futility. Not only did the IRS decline requests to provide guidance on the meaning of the term, the trial record provides no evidence that the IRS ever disallowed a single exchange based on a determination that a QI had engaged in a disqualified transaction because a financial institution of which the QI was an affiliate provided non-routine financial services to the Section 1031 exchange client.

At trial, JPMorgan executive Christine Doria ("Doria") testified that she was unaware of the IRS ever conducting any investigation into or disallowing any transaction based on the disqualification of a QI's Section 1031 exchange services. (Trial Tr. 679.) Without such guidance, JPMorgan could not have performed any

meaningful analysis to help determine whether there was a "reasonable basis" for further investigation. This overarching ambiguity is apparent to anybody who reads the statute, and would have been "routine" knowledge for anybody intimately involved in the Section 1031 business, such as Alton, NESF's general counsel.[3]

While NESF was likely familiar with the absence of IRS guidance and subsequent impracticality of conducting a substantive disqualification analysis for every one of JPEX's 160 or more clients, JPMorgan's failure to make any disclosure whatsoever of its intensive, high-level, unsuccessful efforts to obtain IRS clarification of the meaning of "routine financial services", and the effect that the potential disqualification issue had on JPEX's business, is more problematic. At trial, multiple JPMorgan witnesses testified that JPMorgan expended significant funds over an extended period of time seeking such guidance. JPMorgan justified these expenditures based on the ongoing effect that the statutory ambiguity had on JPEX's ability to obtain new business as well as the concern expressed by JPMorgan officials at the highest levels of the institution about the potential adverse consequences of JPEX continuing to render QI services without clear guidance on the meaning of "routine financial services." (Trial Tr. 1123–24, 1143, 1178–79.) These concerns represent internal facts with which NESF could not be expected to be familiar absent disclosure by JPMorgan.

NESF produced evidence that various prospective JPEX clients specifically sought comprehensive representations from JPEX and/or JPMorgan that JPEX would not be considered a disqualified person for any particular transaction. (*See,*

*e.g.,* Pl.'s Ex. 382; Def.'s Ex. 46; Trial Tr. 1128–31.) JPMorgan officials testified that JPEX did make some representations to some JPEX clients to the effect that JPEX did not believe that JPMorgan provided any non-routine financial services to JPEX clients that might lead to the disqualification of a JPEX like-kind exchange transaction. (*Id.*) However, JPEX declined to represent definitively that it would not be considered disqualified for any particular transaction because of the ambiguity of the regulation and the difficulty for JPEX staff to determine the breadth of financial services JPMorgan provided to particular clients. (*See id.*) As a result, JPEX lost at least some new business in part due to client concerns over the potential disqualification issue. None of this history appears to have been disclosed to NESF during its JPEX purchase due diligence.

JPMorgan may not have had any substantial concern that the IRS would disqualify a JPEX like-kind exchange transaction because, as Lopriore testified at trial, he had never "found any specific non-routine financial services." (Trial Tr. 422:5–10.) Nevertheless, if JPMorgan found the issue to have sufficiently serious implications for JPEX to warrant engaging Skadden Arps, Deloitte, and PwC, it is likely that this history would have represented information that a reasonable buyer of JPEX would have wanted to know when evaluating whether to make a purchase offer and how much to offer. To that extent, the information would have been material to the transaction.

Had JPMorgan raised the potential disqualification issue, senior JPMorgan employees might or might not have satisfied

---

3. During her tenure at the IRS, Alton was a senior employee in the division responsible for Section 1031. (Trial Tr. 1237–38.) As part of her duties at the IRS, Alton worked on

a draft of a proposed regulation which would have amended the definition of a disqualified person. (*Id.*)

NESF that the statutory ambiguity would or would not have affected NESF's future business. Under these circumstances, NESF, which must have been fully aware of the "routine financial services" ambiguity given Alton's involvement on the matter, might well have decided to accept the efforts of JPMorgan and its tax consultants and chosen to proceed with the purchase of JPEX on the same terms. But it is not inconceivable that NESF might have taken a different course. It might have wanted, with JPMorgan's consent, to review the matter more thoroughly with JPMorgan's tax consultants, or to engage its own experts on the matter. Or NESF might have adjusted its offer price based on its informed perception, in light of the disclosure, of potential liabilities related to the threat of disqualification of any JPEX transaction. However, JPMorgan failed to make this disclosure and therefore precluded the possibility of such an open and transparent discussion with NESF, and of any prospect of NESF altering the terms of the transaction.

Notwithstanding JPMorgan's failure to disclose information that could be material concerning the disqualification issue, NESF has offered insufficient evidence of any damages it may have suffered by reason of this lack of disclosure. As is also the case with respect to the disclosures relating to alleged instances of actual or constructive receipt of like-kind exchange funds, NESF has offered no hard evidence, other than Halloran's conclusory statements,[4] providing any justifiable basis that could support a reasonable determination of what effect, if any, JPMorgan's failure to disclose its efforts concerning the disqualification issue had on the valuation

of JPEX or NESF's later operations. Nor has NESF provided evidence that it would have lowered by any specific amount the price it would have paid for JPEX had JPMorgan disclosed its concerns and efforts regarding the routine financial services and potential disqualification issue. NESF has also offered no evidence of any voided JPEX transactions or threatened investigations relating to the disqualification of any JPEX transaction on this ground. Therefore, the Court finds that the chain of potential JPEX liability relating to the prospect of the disqualification of any JPEX transaction by reason of an IRS finding that JPMorgan provided non-routine financial services to a JPEX client is also extremely attenuated. Further, on the record before the Court, any determination of lost profits or reduction in the value of JPEX to NESF, as reflected in the price NESF or a reasonable purchaser might have been willing to pay had JPMorgan made the disclosures concerning disqualification as articulated here, would also be highly speculative. This finding would follow especially taking into account that NESF's provision of services is limited to Section 1031 like-kind exchanges, and therefore it is not subject to the same risk of disqualification of its transactions as a large one-stop financial institution like JPMorgan.

NESF's damages expert, Jim Timmins ("Timmins"), did testify that NESF has suffered an overall impairment in value and lost profits stemming from the overhang of potential liability NESF alleges, combined with an inability to procure investment due to possible liability related to both the potential disqualification issue and the alleged actual or constructive re-

---

4. Mr. Halloran testified that JPMorgan "couldn't have paid [him] to take the business" had he known of the alleged constructive receipt or disqualification issues. (Trial Tr. 85.) Absent more explicit or concrete

evidence relating to a possible reduction in value related specifically to the disclosure of JPMorgan's disqualification-related lobbying activities, the Court cannot speculate on such a valuation.

ceipt incidents. (Trial Tr. 1337–40.) The Court is not persuaded. As detailed above in regards to the issues concerning actual and constructive receipt of like-kind exchange funds, any contingent liability relating to the prospect of disqualification of JPEX transactions is speculative and, should the situation arise, would likely be covered by the indemnity clause in the Share Purchase Agreement. Furthermore, notwithstanding Timmins' expert testimony, NESF presented little concrete evidence to support the assertion that, but for these alleged potential liabilities, certain investors would have invested in NESF.

NESF offered the testimony of a single potential investor, Steven Spitts, whose wife invested $50,000 with NESF, but declined to invest a further unspecified amount allegedly due to the overhang of potential liabilities. (*See* Pl.'s Ex. 609.) David Sandler ("Sandler"), NESF's financial adviser, testified that "generally speaking," potential liabilities affect prospective investments. (Pl.'s Ex. 610.) However, viewed as a whole, Sandler's testimony was at best neutral, and in some respects more detrimental than helpful to NESF's damage claims. Certainly, there was little in what he said that would tip the scale of the evidence into the range of preponderance. For example, Sandler stated that he did not know whether NESF was unable to raise capital by reason of potential liabilities, nor did he know any specific individuals or entities that had refused to invest in NESF because of these alleged potential liabilities. (*Id.*)

### D. THE TRANSFER OF CLIENT ACCOUNTS

NESF also claims that JPMorgan breached its contractual obligations "by failing to use commercially reasonable efforts to assist in promptly transferring exchange accounts to NESF's banks" in violation of Sections 5.2(a) and 5.10 of the Share Purchase Agreement. Under Section 5.2(a) of the Share Purchase Agreement, JPMorgan agreed to "use commercially reasonable efforts to … consummate and make effective, in the most expeditious manner practicable, the transactions contemplated" by the Share Purchase Agreement. (Pl.'s Ex. 543.) Section 5.10 of the Share Purchase Agreement gave NESF the right to demand JPMorgan's resignation from escrow or other similar accounts, and required JPMorgan to resign within five days of receiving such a demand. (Pl.'s Ex. 543.) Specifically, NESF claims that JPMorgan made false representations in an attempt to maintain client accounts and unreasonably delayed sending resignation notices to clients following NESF's demands.

The Court finds the evidence of JPMorgan's alleged interference to be isolated and sporadic at best. The emails and statements by individual JPMorgan bankers cited by NESF as evidence of JPMorgan's interference appear to derive from outliers and are divorced from a more compelling and consistent narrative detailing JPMorgan's active efforts to transfer client accounts to NESF's banks in accordance with NESF's own schedule and instructions. Moreover, there is no evidence that the statements by or actions of those few JPMorgan employees involved in the accounts at issue were authorized by JPMorgan officials empowered to speak for the bank on *these* matters, or that the actions of those employees concerning these issues could be attributed to JPMorgan by virtue of their offices. When viewed in its totality, the evidence presented by NESF simply fails to establish sufficiently any concrete interference by JPMorgan whatsoever, much less the requisite causality necessary to meet NESF's burden.

## 1. *JPEX Clients Opposed Transferring Funds Out of JPMorgan*

If anything, the evidence overwhelmingly indicates that it was JPEX client resistance and objections, as well as NESF's lack of alternative banking relationships acceptable to clients—not interference from the JPMorgan officials involved in the JPEX transaction and authorized to speak for the bank on the matter—that caused any delay in transferring the JPEX client accounts to NESF's designated bank. Shortly after the closing, Halloran acknowledged that "[t]here may be some customers who insist upon keeping their assets with JPM" and that NESF would "not [be] opposed to creating that custodial relationship." (Def.'s Ex. 367.) Halloran reached out to Gallivan and Doria at JPMorgan regarding such a relationship, inquiring "[w]hat rate will JPMorgan pay NES on NEW assets held in Qualified Escrow account?" (*Id.*) However, Gallivan testified at trial that she informed Halloran that JPMorgan did not have a mechanism to offer NESF a spread on new assets brought to JPMorgan. (Trial Tr. 1090.) Nevertheless, NESF continued to open new accounts at JPMorgan following the closing, depositing approximately $13.3 million in new funds. (Def.'s Ex. 638; Trial Tr. 1090–91.)

Notwithstanding any rhetoric to the contrary, the ultimate decision to transfer funds out of JPMorgan required the affirmative request of individual clients. JPMorgan could not execute a transfer without an explicit client transfer request and instructions from NESF on where to transmit the funds. (Trial Tr. 1092–93.) NESF has not provided any compelling evidence of a single situation in which NESF requested and the client authorized a transfer of the funds and JPMorgan obstructed this process. In fact, NESF did not begin circulating draft transition documents until March 2009, approximately five months after the closing of the Share Purchase Agreement. (*See, e.g.,* Def.'s Ex. 523.) JPMorgan promptly responded to NESF's request and on March 6, 2009 provided NESF with three draft resignation letters that JPMorgan itself intended to send to NESF's exchange clients. (Def.'s Ex. 1254.) JPMorgan also forwarded draft internal Frequently Asked Questions documents to be sent to JPMorgan bankers informing them that JPMorgan had sold JPEX and would be resigning as escrow holder and exchange depository on all JPEX client accounts. (Def.'s Ex. 1254.)

The earliest tangible request by NESF for JPMorgan to resign appears to have occurred on March 9, 2009, when NESF requested that JPMorgan send resignation letters to the clients on March 13, 2009. (Def.'s Ex. 553; Trial Tr. 1111.) However, soon thereafter, NESF requested that JPMorgan postpone that date until March 18, 2009. (Def.'s Ex. 547.) Ultimately, JPMorgan began sending resignation letters on March 19, 2009, and by March 27, 2009, had sent a total of 105 resignation letters to each of the JPEX clients that NESF had requested receive such a letter. (*See, e.g.,* Def.'s Exs. 614, 624, 626, 1055.) There is no evidence that any JPMorgan official involved in the transaction and authorized to represent the bank on these matters delayed, much less unreasonably so, in sending out these resignation notices.

While JPMorgan did send out timely resignation letters, due to a variety of complications, it did not immediately terminate all client accounts. In some instances, NESF asked JPMorgan to extend the resignation date because the transition could not be completed prior to the resignation date or because a client had requested that NESF obtain an extension. (*See, e.g.,* Trial Tr. 826–27.) In other in-

stances, clients expressed to NESF and JPMorgan that they would not work with Union Bank of California—NESF's only banking partner in March 2009—or that they needed to consider various other banking options. Brian McNulty, a vice president at NESF, and other witnesses testified at trial that "some clients just refused to move because they had [sic] strong relationship with J.P. Morgan, and they just did not want to move" and "[o]ther clients didn't know who Union Bank of California was, so they had concerns about moving their money to this financial institution they may not have a relationship with." (Trial Tr. 790.) NESF appears to have counseled many clients that it would be "business as usual" following the purchase—which some clients possibly took to mean they could keep deposits at JPMorgan—in order to maintain client business and ease client concerns during turbulent financial times. (See, e.g., Trial Tr. 911; Def.'s Ex. 393.)

NESF specifically highlights the loss of the GE and ENI client accounts as examples of the damages caused by JPMorgan's alleged interference. While NESF points to isolated statements individual JPMorgan bankers made to these clients, it has provided no evidence that either GE or ENI—which had extensive relationships with JPMorgan—would have been willing to transfer their accounts to NESF's depository bank even absent these statements. Indeed, the evidence portrays that these statements by isolated JPMorgan employees were not made to members of the client's senior management team who possessed the decision-making authority over the selection of a depository institution, and there is no evidence that those JPMorgan employees themselves had authority to make binding representations on these matters that could be attributed to JPMorgan. (See Def.'s Ex. 1423.)

In the case of GE, the testimony of both JPEX employees and GE confirm that GE was strongly opposed to transferring its funds due to "major business concerns" including that, unlike JPMorgan, Union Bank of California was not a "preferred bank" for GE. (See, e.g., Trial Tr. 806, 820, 889–90.) In fact, GE affirmatively instructed NESF that it had no authority to transfer GE funds outside of JPMorgan and sought explicit approval from NESF to maintain funds at JPMorgan or at least defer JPMorgan's resignation from the accounts. (See, e.g., Def.'s Ex. 930; Pl.'s Ex. 124; Trial Tr. 930–36.) GE sought this approval because JPMorgan informed GE that it could not maintain funds at JPMorgan without NESF's explicit approval. (Trial Tr. 927, 931.) Ultimately, GE discontinued its QI relationship with NESF; however, this event was not caused by interference by JPMorgan, but rather by GE's overall discomfort with NESF, including GE's disapproval of Union Bank of California as a depository. (Trial Tr. 898, 928–30.) As Peter DiTomaso, GE's tax leader, explained, GE was convinced that NESF's insistence on transferring accounts to NESF's depository was "a pure business play on the part of NES that will cause us additional work and issues that I think GE is just not willing to face at this time." (Def.'s Ex. 581.)

The testimony regarding ENI provides even less support for the contention that JPMorgan obstructed the transfer of client accounts to NESF's depository. Instead, as discussed below, it supports JPMorgan's claim that JPMorgan's senior management was firmly dedicated to transferring client accounts as soon as possible. Deryl Knox, the tax manager at ENI, testified that despite wanting to maintain funds at JPMorgan, ENI was convinced to transfer its account to Union Bank of California by JPMorgan's March 9, 2009 resignation letter transmitted by Gallivan—a

letter that was independently sent *prior* to any formal NESF demand for resignation letters. (Pl.'s Exs. 64, 612.) Under these circumstances, there is no indication that individual JPMorgan bankers had any ability to, much less actually caused, the delay or prevention of the transfer of JPEX client accounts to NESF's depository.

### 2. *JPMorgan Actively Attempted to Transfer Funds*

Rather than interfering with the transfers, the evidence shows that JPMorgan tried to jump-start the process and actively prodded NESF to transfer JPEX client accounts to NESF's depository. As early as January 2009, Gallivan, as executive director of Treasury Services Deposit Products at JPMorgan, sought to facilitate the transfer of these deposits away from JPMorgan. Having not heard from NESF regarding transfers, Gallivan wrote to NESF that JPMorgan was "under the assumption at the time of the closing that there would be a migration plan to another institution that would fit [NESF's] business model better" and explicitly asked NESF to explain its plan. (Def's Ex. 451.) Gallivan testified at trial that JPMorgan was "eager" to transition the pre-closing account balances out of JPMorgan as soon as possible because JPMorgan was losing money by holding the pre-closing client balances. (Trial Tr. 1092.) She explained that JPMorgan classified these deposits as discontinued business post-closing and therefore JPMorgan did not earn a spread on the funds. (*Id.*)

Despite not earning a spread itself, during a six-month period JPMorgan was still contractually required to pay NESF 75 basis points on any funds deposited at JPMorgan prior to the closing that had not been transferred to accounts at NESF's partner banks. (*See, e.g.,* Pl.'s Ex. 543; Trial Tr. 667–68.) As a result, the evidence suggests that JPMorgan was actually losing money during the transition period while it waited for the NESF client accounts to be transferred to another bank. The Court is persuaded that, while certain individuals within JPMorgan may have been upset by the lost client accounts, these individuals lacked the ability to obstruct the transfer of accounts and that JPMorgan as a whole, through the bank officials involved in the JPEX sale transaction and authorized to speak for the institution on these matters, actively cooperated with NESF to facilitate these transfers. In sum, the evidence overall supports a finding that any complications with the transfer of JPEX client accounts that occurred in connection with the JPEX purchase are attributable to procedural hurdles and JPEX client resistance—not to active JPMorgan interference in violation of the bank's contractual obligations to NESF.[5]

### E. *POST–CLOSING FUNDS DEPOSITED AT JPMORGAN*

Under Section 2.3(e) of the Share Purchase Agreement, JPMorgan agreed to pay NESF "estimated Interest Income that could be earned on those balances that will not transfer to Buyer at Closing (the 'Subject Balances') during the period commencing on the Closing Date and ending the date that is 180 days from the Closing Date (the 'True-up Period')."

---

**5.** NESF also claims that it is entitled to certain fees totaling $716,096 that it paid to First Chicago Bank—the bank from which NESF secured financing to purchase JPEX—as a result of complications servicing the loan, including the loan being placed in default for NESF's failure to meet its payment schedule, which NESF attributes to JPMorgan's alleged fraud and breach of contract. (Trial Tr. 1381.) Accordingly, any entitlement NESF may have to reimbursement for these fees must be predicated on NESF's fraud and breach of contract claims and therefore need not be addressed independently.

(Pl.'s Ex. 543.) NESF claims JPMorgan failed to pay a true-up amount for a "$178 million deposit by [ENI]." (Compl.) However, all the evidence presented at trial indicates that this $178 million was deposited after the closing, could not have "transfer[ed] to the Buyer at Closing", and therefore was not a "Subject Balance" pursuant to the Share Purchase Agreement.

### F. MCCLOSKEY BONUS

NESF also claims it is entitled to reimbursement by JPMorgan for the $98,203 bonus for 2008 it paid to McCloskey. As part of the Share Purchase Agreement, JPMorgan was obligated to pay the bonuses of JPEX employees for 2008 explicitly set forth on the Preliminary Balance Sheet provided by JPMorgan in an amount totaling $240,000. McCloskey was a JPEX employee who did not accept a job with NESF prior to the execution of the Share Purchase Agreement and thus was not listed on the Preliminary Balance Sheet detailing the bonuses JPMorgan was obligated to pay. NESF submitted evidence that McCloskey subsequently accepted an employment offer with NESF at some point following the execution of the Share Purchase Agreement, but prior to the closing. However, NESF has not offered any credible evidence that the Preliminary Balance Sheet was amended to reflect McCloskey's 2008 bonus. Therefore, on the record before it, the Court finds that NESF has failed to submit evidence that McCloskey was on the Preliminary Balance Sheet listing the bonuses that JPMorgan agreed to pay.

## II. CONCLUSIONS OF LAW

### A. BREACH OF CONTRACT

■ Under New York law, an action for breach of contract requires: "(1) a contract; (2) the performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v.*

*Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000) (internal quotation marks omitted); *Serdarevic v. Centex Homes, LLC*, 760 F.Supp.2d 322, 330–31 (S.D.N.Y.2010). Here, the parties agree that (1) the Share Purchase Agreement is a valid, written contract and (2) NESF has not failed to perform its obligations under the agreement. Thus, the only issues to be determined are whether JPMorgan breached its obligations under the Share Purchase Agreement and whether NES suffered damages as a proximate cause of that breach.

■ The Court concludes that JPMorgan did not breach its representations and warranties in the Share Purchase Agreement by not disclosing the particular instances of actual or constructive receipt of Section 1031 exchange funds that NESF alleges occurred under JPEX's management because (1) the events and transactions at issue did not constitute liabilities as defined under GAAP that JPMorgan was required to disclose; (2) there is no evidence that any JPEX client has asserted or taken or threatened, or will probably assert or take or threaten, any action against JPEX or JPMorgan relating to these alleged violations of the (g)(6) Restrictions, or that in the event such action were asserted or taken or threatened there is a reasonable possibility that its outcome would be unfavorable to JPEX or JPMorgan; and (3) the factual circumstances—including the affirmative decision-making role the relevant JPEX clients played in structuring their Section 1031 exchange accounts—support a conclusion that the instances of actual or constructive receipt of Section 1031 funds that NESF alleges occurred would not reasonably give rise to the assertion of a claim against JPEX.

However, the Court does find that JPMorgan's concern about and extensive

efforts to address the disqualification issue by attempting to obtain IRS clarification of the meaning of "non-routine financial services" was material information that a reasonable purchaser of JPEX would have wanted to know, and thus that JPMorgan should have disclosed this information to NESF in the course of due diligence. Even if JPMorgan's failure to disclose this information did not explicitly breach the letter of any of its representations and warranties under the Share Purchase Agreement because there was no probable or even reasonable "legal" threat relating to the disqualification issue, at some point during the due diligence process, JPMorgan should have disclosed its intense efforts due to the *business* effect the statutory ambiguity had on JPEX. Despite JPMorgan's failure to make this material disclosure, the Court finds that NESF has not presented sufficiently concrete evidence relating to what effect, if any, that information would have had on the market value for JPEX or on NESF's operations. On the record before the Court, any damages NESF alleges attributable to this failure to disclose have not been established by sufficient evidence and would be unduly speculative.

■ The Court further concludes that JPMorgan did not interfere with the transfer of JPEX client accounts to NESF's depository or delay in resigning from client accounts and therefore did not breach its obligations under Sections 5.2(a) and 5.10 of the Share Purchase Agreement. For these reasons, NESF is not entitled to relief on any of its breach of contract claims.

## B. *FRAUD*

■ Under both New York and California law, an action for fraud requires that the plaintiff prove: (1) that the defendant made a material misrepresentation; (2) with knowledge of its falsity; (3) with an intent to defraud; (4) that the plaintiff reasonably relied on the misrepresentation; and (5) that plaintiff suffered damages as a result. *See Schlaifer Nance & Co., Inc. v. Estate of Andy Warhol,* 927 F.Supp. 650, 660 (S.D.N.Y.1996); *Hinesley v. Oakshade Town Ctr.,* 135 Cal.App.4th 289, 294, 37 Cal.Rptr.3d 364 (2005). In New York, the plaintiff has the burden of proving each individual element of fraud by clear and convincing evidence. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir.2007). Under California law, the plaintiff must prove the elements of fraud by a preponderance of the evidence. *Liodas v. Sahadi,* 19 Cal.3d 278, 292–93, 137 Cal.Rptr. 635, 562 P.2d 316 (1977).

■ The Court concludes that regardless of whether California or New York law governs NESF's fraud claims, on the trial record here, NESF has not met its burden of establishing the elements of a fraud claim. First, though the Court has found that JPMorgan failed to disclose to NESF during due diligence the concerns JPEX and JPMorgan officials had over the potential disqualification issue pertaining to the definition of "routine financial services", and JPMorgan's efforts to obtain IRS clarification of the meaning of that provision, the Court is not convinced, based on the trial record here, that JPMorgan's omission constituted a knowing or reckless misrepresentation of a material fact made with intent to defraud. *See Merrill Lynch & Co. v. Allegheny Energy, Inc.,* 500 F.3d 171, 181 (2d Cir. 2007). Moreover, even if JPMorgan's failure to disclose this matter were to satisfy the knowledge and intent prerequisite of a cause of action for fraud, the Court concludes, substantially for the same reasons discussed above in connection with NESF's breach of contract claim, that NESF did not present sufficient evidence

to establish the damages it claims attributable to this omission, or to any of its other claims.

## C. TORTIOUS INTERFERENCE

■ To establish tortious interference with prospective business relations, a plaintiff must establish: (1) there was a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interfered with it; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship. *Boehner v. Heise,* 734 F.Supp.2d 389, 405 (S.D.N.Y.2010). The Court finds that because JPMorgan actively cooperated in the transfer of JPEX client accounts to NESF's depository and did not breach its contractual obligations, NESF has failed to prove its claim for tortious interference. *See, e.g., In re WorldCom, Inc.,* 361 B.R. 697, 719 (S.D.N.Y.2007); *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190, 193 (1987).

## D. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Under New York law, there is no "separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir.2002); *see also Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.,* 90 F.Supp.2d 401, 419 (S.D.N.Y.2000). The Court finds that NESF's claim for a breach of the implied covenant of good faith and fair dealing is duplicative of its claim for breach of contract and therefore not sustainable under New York law.[6]

## E. INDEMNIFICATION

■■ In order for an indemnity claim to arise under New York law, the party seeking indemnification must have suffered a loss or had liability imposed. *See Pfizer, Inc. v. Stryker Corp.,* 348 F.Supp.2d 131, 150 (S.D.N.Y.2004). In certain circumstances, a third-party plaintiff may obtain a conditional judgment fixing liability prior to the resolution of a principal action, but not before the principal action itself has been filed. *See Town of Wappinger v. Republic Ins. Co.,* 89 A.D.2d 621, 622, 452 N.Y.S.2d 674, 675 (N.Y.App.Div. 2d Dep't 1982) (*citing McCabe v. Queensboro Farm Prods., Inc.,* 22 N.Y.2d 204, 208, 292 N.Y.S.2d 400, 239 N.E.2d 340 (N.Y.1968)). NESF has provided no evidence of any JPEX client that has sued NESF or is seeking indemnity from NESF and therefore cannot sustain a claim for indemnity.

## III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the Clerk of Court is directed to enter judgment in favor of JPMorgan Chase Bank, National Association, dismissing the complaint of plaintiff NES Financial Corp.; and it is further

**ORDERED** that the Clerk of Court is directed to withdraw any pending motions and to close this case.

**SO ORDERED.**

---

**6.** NESF has failed to establish damages relating to either the breach of contract or fraud claims and therefore no basis exists for punitive damages.